IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT NASHVILLE
Assigned on Briefs October 16, 2018

## HEATHER ROGERS MCCOLLUM v. STATE OF TENNESSEE

**Appeal from the Circuit Court for Marshall County**
**No. 17-CR-50-PCR     F. Lee Russell, Judge**

_____

### No. M2017-02070-CCA-R3-PC

_____

The Petitioner, Heather Rogers McCollum, appeals from the Marshall County Circuit Court's denial of her petition for post-conviction relief. The Petitioner contends that she received ineffective assistance of counsel because (1) trial counsel "did not move to suppress her confession at trial"; and (2) appellate counsel did not "address the issue of the physical facts rule in his appellate brief." Discerning no error, we affirm the judgment of the post-conviction court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Circuit Court Affirmed**

D. KELLY THOMAS, JR., J., delivered the opinion of the court, in which THOMAS T. WOODALL and ROBERT H. MONTGOMERY, JR., JJ., joined.

Matthew D. Wilson, Starkville, Mississippi, for the appellant, Heather Rogers McCollum.

Herbert H. Slatery III, Attorney General and Reporter; M. Todd Ridley, Assistant Attorney General; Robert James Carter, District Attorney General; and William Benjamin Bottoms, Assistant District Attorney General, for the appellee, State of Tennessee.

### OPINION

### FACTUAL BACKGROUND

Following a jury trial, the Petitioner was convicted of first degree murder and arson. State v. Heather Renee McCollum, No. M2015-00656-CCA-R3-CD, 2016 WL 1292893, at *1 (Tenn. Crim. App. Apr. 1, 2016), perm. app. denied (Tenn. Aug. 18, 2016). The trial court imposed a total effective sentence of life imprisonment plus five years. Id. This court affirmed the Petitioner's convictions and sentences on direct

appeal.  Id.  On August 18, 2016, our supreme court declined to review this court's opinion.

On the evening of August 13, 2012, the Petitioner stabbed the victim, who "had only one leg and wore a prosthesis," twelve times and then set fire to the victim's home. McCollum, 2016 WL 1292893, at *1, 7-8, 15.  The victim's body was found on his bed with his pants "between his hips and knees" and a heap of "other clothing in the area that was very burned."  Id. at *4.  A broken knife blade was found when investigators sifted "through the burned bedding."  Id. at *5.  The blade matched a "knife blade that was found around the perimeter of [the Petitioner's] residence."  Id. at *15.

Investigators identified "'four unrelated points of origin' of the fire in the victim's residence."  McCollum, 2016 WL 1292893, at *5.  The victim's body was a point of origin with the bedding material ignited first and then "additional debris was placed on top of the victim to provide the fire with more fuel."  Id.  Other points of origin were identified in the bedroom closet, "a rag placed on the stove" in the kitchen, and "the right arm of the love seat" in the living room.  Id. at *5-6.

The Petitioner was identified as a suspect and interviewed by investigators on five separate occasions.  McCollum, 2016 WL 1292893, at *6.  The Petitioner stated that she had known the victim "since she was fourteen or fifteen years old, at which time the victim began buying beer for her."  Id. at *9.  The Petitioner also stated that "the victim previously had made sexual comments toward her" and that "she had been sexually abused as a child."  Id. at *9, 12.

Approximately two months prior to the murder, the Petitioner reported to the police that the victim had molested her three-year-old daughter and that her four-year-old son had witnessed it.  McCollum, 2016 WL 1292893, at *8, 10-12.  The Petitioner believed that the police did not take the allegation seriously and had stated prior to the murder that she would "'take care of it in [her] own way.'"  Id. at *11.

The Petitioner initially denied any involvement in the victim's killing.  McCollum, 2016 WL 1292893, at *6-7.  However, in her third statement, the Petitioner admitted that she had called the victim on the night of the murder and asked him to "drive her to a store where she could purchase beer."  Id. at *7.  They then went to the victim's home where they "sat together on the loveseat," and the victim rubbed her leg.  Id.  The Petitioner described what happened next as follows:

> We were talking about the kids.  He said that he did not touch [my daughter] and asked if I wanted to go in the bedroom and have sex.  At that point in time, I started getting angry because of the situation with my daughter.  We went into the bedroom.  I got undressed . . . .

-2-

As he was getting undressed and taking off his leg, I went into the kitchen and got a steak knife with a jagged edge about six inches long with a plastic black handle out of his sink . . . .

I got the knife because he provoked me because of what he was saying to me and about the situation with my daughter. I walked back to the bedroom with the knife and held it behind my back in my right hand. The lights were off in the bedroom except for a night light that was on. [The victim] was lying on the bed wearing only his black . . . boxers. I got on the bed and sat on him[,] straddling his legs. I was completely naked . . . .

I took the knife from behind my back and I started stabbing him. I stabbed him under his armpit first. He said, ["][T]hat hurts.["] He then tried to sit up. I kept on stabbing him in his stomach and chest area. He then laid [sic] back in the bed. He said, ["]I think I am about to die.["] I saw him then take his last breath.

I sat there for a few minutes and I checked his pulse and didn't feel anything. I got up and grabbed some ammonia from the kitchen counter. It was in a spray bottle. I took the top off the bottle and poured it out on the bed. I then took my BIC lighter and lit the bed on fire.

After that, I caught the closet clothes on fire with my lighter. I then went into the kitchen and tried to set the kitchen on fire by lighting the wires behind the stove . . . . I set the fire because I didn't want to leave any evidence. I saw his bedroom on fire and the flames spreading, so I got the hell out. I walked out the front door and walked home. It was about 11[:00] p.m. then.

I took the knife that I stabbed [the victim] with and took it outside behind my apartment and put it in a bucket. I then squirted some lighter fluid in the bucket and set it on fire. The fire burned off the plastic part but not the metal part. I took the burned knife and threw it in the bushes behind my apartment. I went inside the apartment, washed my hands in the bathtub and then went to bed . . . .

Id. (alterations in original) (footnote omitted).

The Petitioner confessed two more times to the investigators, telling them that she "did not regret her actions," that the police "investigation into her allegations against the victim was not moving fast enough[,] and that '[t]hey didn't make him pay for it.'" McCollum, 2016 WL 1292893, at *8 (alternation in original). In her last statement to the

-3-

investigators, the Petitioner "indicated that her husband had returned to the victim's residence and started the fire." Id.

The Petitioner's husband told investigators that the Petitioner had returned home that night wearing "a white bra and blue jeans" with "blood on her right shoulder and across her chest." McCollum, 2016 WL 1292893, at *10. The Petitioner's husband told the Petitioner that "the only way [he] knew to cover up stab wounds was to set the house on fire, so it would look like an electrical fire." Id. The Petitioner's husband then stated as follows:

> I left our house[] and told her that she didn't need to be seen back over there.
>
> I walked from our house back to [the victim's] house. When I got there, I used my shirt to open the front door. I went inside and saw [the victim] lying across the bed on his back, not breathing. I took a lighter out of my pocket and lit the sheets he was lying on . . . top of. I lit a wire in the closets, then lit the jackets and shirts in the closets, one by one. Then I went into the kitchen, went in the kitchen, and lit a large white dishrag that was lying on top of the stove. Then I came out of the kitchen, the bed wasn't burning good, so I took some clothes off the top of the dresser and threw them on top of him. Once I done this, the bed started burning more. I left the bedroom and went into the living room. When I got into the living room, I lit the front end of the couch on fire.

Id. (alterations in original).

The arson investigator noted that the Petitioner's husband's statement "was consistent with each of the four points of origin of [the] fire." McCollum, 2016 WL 1292893, at *16. However, he also "confirmed that over the course of all of [the Petitioner's] statements, she accounted for all four points of origin." Id. The arson investigator "opined that [the Petitioner] and [the Petitioner's husband's] statements were 'equal' because both of them had at least one inconsistency with the evidence." Id.

Following the affirmance of her convictions, the Petitioner filed a timely pro se petition for post-conviction relief. The Petitioner alleged that her convictions were "based on [the] use of [a] coerced confession" and "a violation of the privilege against self[-]incrimination." The Petitioner also alleged that she received ineffective assistance of trial counsel, specifically alleging that trial counsel was ineffective for failing to

challenge the admission of the Petitioner's husband's statement.[1]  Counsel was appointed to represent the Petitioner is this matter, but no amended petition was filed on her behalf.

At the post-conviction hearing, the Petitioner's counsel alleged that trial counsel was ineffective for failing to file a motion to suppress the Petitioner's "statement to the police."  The Petitioner's counsel alleged that the Petitioner was not mentally competent to waive her rights because she was possibly suffering from postpartum depression at the time of the interviews.  There was no mention at the post-conviction hearing of the physical facts rule or whether that issue was properly raised on direct appeal.

Trial counsel admitted that the Petitioner had given birth approximately three months before the murder.  However, trial counsel recalled that the Petitioner had undergone a mental evaluation while her case was in general sessions court and that she was found competent.  Trial counsel testified that he "always felt like she was competent" based on his interactions with her.  Trial counsel also believed that the Petitioner was competent to waive her rights when interviewed by the police.  Trial counsel testified that this belief was based on his having listened to the interviews and his conversations with the Petitioner about them.

Trial counsel admitted that he did not file a motion to suppress the Petitioner's statements.  Trial counsel testified that he did not believe there was a valid legal basis for such a motion.  Trial counsel noted that the investigators "went over [the Petitioner's] <u>Miranda</u> rights" with her multiple times and that this was on the recordings of the interviews.  Trial counsel believed "that [the Petitioner] understood" the waivers and that "they were done properly."

Trial counsel also did not file a suppression motion because he thought that there was "a lot of stuff in those interviews that helped her."  Trial counsel explained that in the statements, the Petitioner was "talking about believing that her child had been sexually molested . . . and where she had been molested . . . when she was younger."  Trial counsel testified that he was able to use the Petitioner's statements to get her version of events in front of the jury without subjecting her to cross-examination.

Trial counsel noted that the "evidence [of the Petitioner's guilt] was strong" and that there "never was any doubt . . . whether she did it or not."  Trial counsel's strategy was to argue that the Petitioner had committed voluntary manslaughter because she believed that her daughter had been molested by the victim and "was under the stress and excitement . . . of that event."  Trial counsel did not believe that "anyone trying this case would have . . . sold it to the jury that she didn't commit the offense."

---

[1] The Petitioner raised several other claims in her petition.  However, this opinion will focus solely on the claims raised in her appellate brief.  All other claims have been waived.  <u>See</u> Tenn. R. App. P. 36(a).

Trial counsel testified that he did not challenge the admission of the Petitioner's husband's statement because he felt that the husband's statement matched the arson investigator's testimony about the points of origin of the fire better than the Petitioner's statements. Trial counsel hoped that the jury would believe the husband's statement over the Petitioner's and acquit her of the arson charge.

The post-conviction court orally denied the petition at the conclusion of the post-conviction hearing. The post-conviction court recalled that the Petitioner's trial had lasted almost two weeks and that the Petitioner had sincerely thanked the jurors "for their time" when they "came back with their guilty verdict." The post-conviction court concluded that trial counsel's decision not to file a motion to suppress the Petitioner's statements was a reasonable strategic decision because the statements allowed trial counsel to argue that the Petitioner had committed voluntary manslaughter rather than first degree premeditated murder. The post-conviction court stated that trial counsel "did everything that he could for" the Petitioner.

The post-conviction court also issued a written order denying the petition. In the written order, the post-conviction court concluded that the Petitioner had failed to establish that there was a valid legal basis for a motion to suppress the Petitioner's statements. The post-conviction court reiterated that trial counsel's decision to use the statements at trial was a reasonable strategic decision. Additionally, the post-conviction court concluded that the Petitioner had not proven that she suffered from postpartum depression at the time she gave her statements nor that, if she did suffer from postpartum depression, it affected her competency to waive her constitutional rights.

## ANALYSIS

The Petitioner contends that she received ineffective assistance of counsel. The Petitioner argues that trial counsel was ineffective for failing to file a motion to suppress her statements because trial counsel "could have argued undue influence, duress, or otherwise presented evidence of her adverse mental state" and that "the State's case against her for murder would have been substantially weaker" without the statements. The Petitioner also argues that the arson conviction might have been reversed if appellate counsel "had addressed the physical facts rule in his brief." The State responds that the post-conviction court did not err in denying the petition.

The burden in a post-conviction proceeding is on the petitioner to prove her allegations of fact supporting her grounds for relief by clear and convincing evidence. Tenn. Code Ann. § 40-30-110(f); see Dellinger v. State, 279 S.W.3d 282, 293-94 (Tenn. 2009). On appeal, we are bound by the post-conviction court's findings of fact unless we conclude that the evidence in the record preponderates against those findings. Fields v. State, 40 S.W.3d 450, 456 (Tenn. 2001). Additionally, "questions concerning the

credibility of witnesses, the weight and value to be given their testimony, and the factual issues raised by the evidence are to be resolved" by the post-conviction court. Id. However, we review the post-conviction court's application of the law to its factual findings de novo with no presumption of correctness. Id. at 457.

Post-conviction relief is available when a "conviction or sentence is void or voidable because of the abridgment of any right guaranteed by the Constitution of Tennessee or the Constitution of the United States." Tenn. Code Ann. § 40-30-103. Criminal defendants are constitutionally guaranteed the right to effective assistance of counsel. Dellinger, 279 S.W.3d at 293 (citing U.S. Const. amend. VI; Cuyler v. Sullivan, 446 U.S. 335, 344 (1980)). When a claim of ineffective assistance of counsel is made under the Sixth Amendment to the United States Constitution, the burden is on the petitioner to show (1) that counsel's performance was deficient and (2) that the deficiency was prejudicial. Strickland v. Washington, 466 U.S. 668, 687 (1984); see Lockhart v. Fretwell, 506 U.S. 364, 368-72 (1993).

Deficient performance requires a showing that "counsel's representation fell below an objective standard of reasonableness," despite the fact that reviewing courts "must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." Strickland, 466 U.S. at 688-89. Prejudice requires proof of "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." Id. at 694. "Because a petitioner must establish both prongs of the test, a failure to prove either deficiency or prejudice provides a sufficient basis to deny relief on the ineffective assistance claim." Goad v. State, 938 S.W.2d 363, 370 (Tenn. 1996). The Strickland standard has been applied to the right to counsel under article I, section 9 of the Tennessee Constitution. State v. Melson, 772 S.W.2d 417, 419 n.2 (Tenn. 1989).

Regarding trial counsel's decision not to file a suppression motion, the Petitioner has failed to prove her factual allegations by clear and convincing evidence. The Post-Conviction Procedure Act requires a petitioner to testify at the post-conviction hearing "if the petition raises substantial questions of fact as to events in which the petitioner participated." Tenn. Code Ann. § 40-30-110(a); see also Tenn. Sup. Ct. R. 28, § 8(C)(1)(b) (stating the same). Trial counsel testified that the investigators "went over [the Petitioner's] Miranda rights" with her multiple times and that this was on the recordings of the interviews. Trial counsel listened to those recordings and talked to the Petitioner about the interviews. Based upon that, trial counsel believed "that [the Petitioner] understood" the investigators' explanation of her rights and that "they were done properly." By not testifying at the post-conviction hearing, the Petitioner failed to present any evidence to challenge trial counsel's opinion that there was no legal basis for a suppression motion.

Similarly, the Petitioner failed to prove by clear and convincing evidence her claim that she was not competent to waive her rights because she was suffering from postpartum depression. Trial counsel testified that the Petitioner had undergone a mental evaluation while her case was pending in general sessions court and that she was deemed competent. Likewise, trial counsel testified that he "always felt like [the Petitioner] was competent" based on his interactions with her. Moreover, the Petitioner failed "to present the testimony of an expert at the evidentiary hearing to explain what, if any, mental health evidence trial counsel should have advanced" in a suppression motion. Demario Johnson v. State, No. W2011-02123-CCA-R3-PC, 2013 WL 772795, at *8 (Tenn. Crim. App. Feb. 27, 2013). We cannot speculate as to what such evidence may have revealed if it had been presented at the post-conviction hearing. See Black v. State, 794 S.W.2d 752, 757 (Tenn. Crim. App. 1990).

Furthermore, trial counsel's decision to not challenge the admissibility of the Petitioner's statements was a reasonable strategic decision. There are "countless ways to provide effective assistance in any given case," and "[e]ven the best criminal defense attorneys would not defend a particular client in the same way." Felts v. State, 354 S.W.3d 266, 277 (Tenn. 2011) (internal quotation marks omitted) (quoting Strickland, 466 U.S. at 689). As such, strategic decisions "made after thorough investigation of law and facts relevant to plausible options are virtually unchallengeable" on post-conviction review. Id. (internal quotation marks omitted) (quoting Strickland, 466 U.S. at 690). "The fact that a particular strategy or tactical decision failed does not by itself establish deficiency." Id. (citing Goad, 938 S.W.2d at 369).

Trial counsel testified that there was "a lot of stuff in those interviews that helped" the Petitioner. Trial counsel explained that in the statements, the Petitioner was "talking about believing that her child had been sexually molested . . . and where she had been molested . . . when she was younger." Trial counsel testified that he was able to use the Petitioner's statements to get her version of events in front of the jury without subjecting her to cross-examination. When a trial counsel's strategic choices are informed and made with adequate preparation, this court does not measure them with "20-20 hindsight" or "sit to second guess . . . [those] choices made by trial counsel." Hellard v. State, 629 S.W.2d 4, 10 (Tenn. 1982) (internal quotation marks omitted) (quoting United States v. DeCoster, 487 F.2d 1197, 1201 (D.C. Cir. 1973)). Accordingly, we conclude that the post-conviction court did not err in denying post-conviction relief on this issue.

The Petitioner did not raise her argument that appellate counsel was ineffective for failing to address "the physical facts rule in his brief" in her pro se petition for post-conviction relief or at the post-conviction hearing. As such, that issue has been waived. See Tenn. Code Ann. §§ 40-30-110(c), (f) (limiting the proof at the post-conviction hearing to "evidence of the allegations of fact in the petition" and noting that

there "is a rebuttable presumption that a ground for relief not raised before a court of competent jurisdiction in which the ground could have been presented is waived"); see also State v. Alvarado, 961 S.W.2d 136, 153 (Tenn. Crim. App. 1996) (noting that "[o]rdinarily, issues raised for the first time on appeal are waived").

Waiver notwithstanding, this issue is without merit. The physical facts rule is "the accepted proposition that in cases where the testimony of a witness is entirely irreconcilable with the physical evidence, the testimony can be disregarded." State v. Allen, 259 S.W.3d 671, 679 (Tenn. 2008) (internal quotation marks omitted) (quoting State v. Hornsby, 858 S.W.2d 892, 894 (Tenn. 1993)). Here, the arson investigator testified that both the Petitioner's and her husband's statements "accounted for all four points of origin" for the fire. McCollum, 2016 WL 1292893, at *16. The arson investigator "opined that [the Petitioner's] and [her husband's] statements were 'equal' because both of them had at least one inconsistency with the evidence." Id. As the physical facts rule is inapplicable to this case, the Petitioner has failed to demonstrate how she was prejudiced by appellate counsel's failure to address it in the appellate brief.

## CONCLUSION

Upon consideration of the foregoing and the record as a whole, the judgment of the post-conviction court is affirmed.

_____
D. KELLY THOMAS, JR., JUDGE