IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE

AT KNOXVILLE

JULY 1999 SESSION

FILED

August 26, 1999

Cecil Crowson, Jr.
Appellate Court
Clerk

| | | |
|---|---|---|
| STATE OF TENNESSEE, | * | C.C.A. # 03C01-9803-CR-00103 |
| Appellee, | * | KNOX COUNTY |
| VS. | * | Hon. Richard R. Baumgartner, Judge |
| JAMES O. MARTIN, | * | (Aggravated Arson) |
| Appellant. | * | |

For Appellant:

David L. Bacon, Attorney
602 South Gay Street
Suite 600
Knoxville, TN 37902

For Appellee:

Paul G. Summers
Attorney General and Reporter

Todd R. Kelley
Assistant Attorney General
425 Fifth Avenue North
Second Floor, Cordell Hull Building
Nashville, TN 37243-0493

Randall E. Nichols
District Attorney General

Scott Green
Assistant District Attorney General
City-County Building
Knoxville, TN 37902

OPINION FILED:_____

AFFIRMED

GARY R. WADE, PRESIDING JUDGE

The defendant, James O. Martin, was tried and convicted of aggravated arson. Tenn. Code Ann. § 39-14-302. The trial judge imposed a twenty-two year sentence. In this appeal of right, the defendant claims that the evidence was insufficient, that it was physically impossible for the defendant to commit this crime, and that his right to a fair and impartial jury was violated by the inclusion of a biased juror. We find no error and affirm the judgment of the trial court.

On the evening of October 12, 1996, Arson Investigator Lynn Kirby of the Knoxville Fire Department was called upon to investigate a fire at the residence of Mr. and Mrs. William Brashears at 916 Dinwiddie Street in Knoxville.

When Investigator Kirby arrived at the scene, he found two cans of charcoal lighter fluid on the roof, pieces of a sheet, a piece of towel, a melted plastic jug, and a Tvarstki Vodka bottle. It was his opinion that the fire was initiated on the roof where melted plastic was found.

At trial, the state presented proof that just prior to the fire, the defendant went to the residence of Jackie Neubill at 1008 Dinwiddie Street, left there to acquire three bottles of Tvarstki Vodka, and, upon his return, announced, "Somebody needs to burn [William Bill Brashears'] house down." The defendant had been drinking heavily by the time he made the remark, appeared to be depressed over the loss of one or more family members, and ultimately expressed anger towards Brashears, "blaming [him] for his family being destroyed...." Ms. Neubill had two cans of Kroger charcoal lighting fluid sitting on her back porch just before the fire. She stated that the two cans were missing just after the fire and

2

confirmed that the defendant had access to her porch. Ms. Neubill testified that two canisters found at the scene of the fire were identical in size and make as those taken from her back porch.

Brashears was alerted by neighbors that his house was on fire. After the fire was extinguished, he observed an altercation in the street involving the defendant, who had been accused by others present of setting the fire. At one point, the defendant stated, "Hell, yeah, I set the guy's house on fire. The son[-]of [-]a[-]bitch caused me to lose my kids and everything. He has turned me in." Brashears, his wife, and their one-year-old grandchild were in the house at the time the fire was set. Brashears confirmed that he had previously complained to the Knoxville Police Department about the behavior of the defendant. He testified that about two months prior to the fire, the defendant had helped his stepfather put a roof on the Brashears' residence.

Just prior to the fire, the defendant went to the residence of Prentice Hatmaker. Hatmaker's sister-in-law, Lillian Irene Smith, testified that, while there, the defendant suggested to Hatmaker, "Come on. Let's go down here and burn this ... house...." Later in the conversation, she recalled that the defendant said, "Well, if you can't do it ... I will do it." She stated that the defendant left the Hatmaker residence and, upon his return about ten or fifteen minutes later announced, "Well, it is taken care of now." Ms. Smith testified that she heard fire trucks arrive about ten minutes thereafter.

David Long, who was at the Hatmaker residence at the time of the defendant's visit, testified that he purchased a gallon of gas at the defendant's request just prior to the fire. The defendant informed Long that he had run out of

gas and needed some for his van. Long returned the gasoline in a plastic anti-freeze container.

After the fire started, the defendant walked to the Neubill house "very excited" and said, "Listen for the fire trucks." Ms. Neubill stated that because the defendant was "very intoxicated" at the time, she did not initially take him seriously. When Ms. Neubill heard the fire trucks, the defendant stated, "I tried to use a [Molotov] cocktail, and it didn't work." The defendant stated that the 80-proof Vodka would not burn but the 100-proof would.

The defendant, who testified on his own behalf, acknowledged three prior offenses of grand larceny, escape, and theft. He claimed that he had no knowledge of setting fire to James Brashears' residence but did concede that he did things when he was drunk that he did not remember afterward. He denied being depressed over any family loss on the date of the fire but did acknowledge that Prentice Hatmaker had said that Brashears, who was a frequent user of a citizens band radio, had bragged about giving information to police which led to the prior arrest of the defendant and Hatmaker on unrelated charges. He asserted that Hatmaker brought up the subject of burning the Brashears' house on the night of the fire and the defendant answered, "The house won't burn ... [i]t is stone...." The defendant stated that he otherwise had no recollection of what happened the rest of the evening because of his use of an anti-depressant medication and his consumption of alcohol.

I

Initially, the defendant claims that the evidence was insufficient because the state failed to prove that the defendant "knowingly" committed a crime

4

of aggravated arson. On appeal, of course, the state is entitled to the strongest legitimate view of the evidence and all reasonable inferences which might be drawn therefrom. State v. Cabbage, 571 S.W.2d 832, 835 (Tenn. 1978). The credibility of the witnesses, the weight to be given their testimony, and the reconciliation of conflicts in the proof are matters entrusted to the jury as trier of fact. Byrge v. State, 575 S.W.2d 292, 295 (Tenn. Crim. App. 1978). When the sufficiency of the evidence is challenged, the relevant question is whether, after reviewing the evidence in the light most favorable to the state, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. State v. Williams, 657 S.W.2d 405, 410 (Tenn. 1983); Tenn. R. App. P. 13(e). The statute provides as follows:

> **Arson.**--(a) A person commits an offense who knowingly damages any structure by means of fire or explosion:
>   (1) Without the consent of all persons who have a possessory, proprietary or security interest therein; or
>   (2) With intent to destroy or damage any structure to collect insurance for the damage or destruction or for any unlawful purpose....

Tenn. Code Ann. § 39-14-301. The offense is aggravated under the following circumstances:

> (1) When one (1) or more persons are present therein; or
>
> (2) When any person, including firefighters and law enforcement officials, suffers serious injury as a result of the fire or explosion.

Tenn. Code Ann. § 39-14-302(a). Aggravated arson is a Class A felony. Tenn. Code Ann. § 39-14-302(b).

The mens rea of "knowing" requires that "the person is aware of the nature of the conduct" or the accompanying circumstances. Tenn. Code Ann. § 39-11-302(b). Voluntary intoxication is not a defense to prosecution. Tenn. Code Ann. § 39-11-503(a). Evidence of such intoxication may, however, be admitted to negate

5

the mens rea.  Id.  The jury must consider the extent and effect of the intoxication upon the defendant's ability to act knowingly.  Whether the defense applies is a question for the jury.  See State v. Bullington, 532 S.W.2d 556, 560-61 (Tenn. 1976); State v. Givens, 631 S.W.2d 720, 721 (Tenn. Crim. App. 1982).

Here, the evidence established that the defendant was intoxicated at the time of the offense.  Nevertheless, there were other circumstances which warranted the jury's conclusion that the defendant had the mental capacity to knowingly set the fire.  The state proved that the defendant made several statements prior to the fire that he intended to burn the Brashears' residence.  He bought bottles of Vodka from the liquor store and arranged for David Long to purchase a gallon of gasoline in a plastic container.  There was proof that he took two charcoal lighter canisters from the Neubill residence just before the fire was set. Because the defendant thought Brashears had "snitched" to police his involvement in a prior offense, the defendant had a possible motive.  There was also proof that the defendant was familiar not only with the Brashears' residence but also the materials which made up the roof.  From all of this, a rational trier of fact could have determined that the defendant possessed the requisite culpable mental state despite his level of intoxication.

II

Next, the defendant claims that the evidence was insufficient to overcome the presumption of innocence.  The defendant contends that the evidence showed it was physically impossible for the defendant to have committed the crime alleged by the state.

The defendant relies on the "physical facts rule" which is the "accepted

6

proposition that in cases where the testimony of a witness is entirely irreconcilable with the physical evidence, the testimony can be disregarded." State v. Hornsby, 858 S.W.2d 892, 894 (Tenn. 1993). "'[W]here undisputed physical facts are entirely inconsistent with and opposed to testimony ... the physical facts must control. No jury can be allowed to return a verdict based upon oral testimony which is flatly opposed to physical facts, the existence of which is incontrovertibly established.'" Id., 858 S.W.2d at 894 (quoting Wood v. United States, 342 F.2d 708, 713-14 (8th Cir. 1965)).

In order for the physical facts rule to apply, the "facts used to negate the testimony must be 'well-established and universally recognized physical laws.'" Hornsby, 858 S.W.2d at 895 (quoting Nelms v. Tennessee Farmers Mutual Ins. Co., 613 S.W.2d 481, 483 (Tenn. App. 1978)). It has also been clearly established by the courts that "in order for testimony to be considered incredible as a matter of law, it must be unbelievable on its face, i.e., testimony as to facts ... that the witness physically could not have possibly observed or events that could not have occurred under the laws of nature." Hornsby, 858 S.W.2d at 894.

The only evidence presented by the defendant to support his claim was his own testimony that it was physically impossible for him to climb on the victim's roof. Such evidence is not sufficient for the physical facts rule to apply. The jury chose to discredit the defendant's testimony. Such a choice was reasonable and this court will not reweigh the evidence.

III

The defendant contends that the trial court erred by allowing Claude Phillip Foster to serve as a member of the jury. The defendant claimed that juror

7

Foster had served as his bailbondsman in the past and, after a failure to appear, "had chased him into North Carolina and one other state...." The defendant contended that juror Foster did not respond during voir dire when the jurors were asked whether they had been victims of crimes when, in fact, two members of his family had been murdered some two months prior to trial. Defense counsel apparently learned of these circumstances when juror Foster revealed the information during voir dire in a subsequent case. The state asserts that the defendant was fully aware that juror Foster had served as a bailbondsman and chose not to utilize a preemptory challenge or otherwise make objection.

After the trial, juror Foster testified that he did not recall the defendant and that, during deliberations, there was no extraneous information communicated to any of the members of the jury. He stated that it was only after trial, when it was brought to his attention, that he recalled having made a security bond for the defendant while employed by Freedom Bonding Company. Juror Foster explained that he did not remember the defendant because their meeting took place some seven years prior to the trial and that he had made appearance bonds for over 800 other individuals while employed as an agent. Juror Foster also testified that during voir dire the question posed to the jury was whether the prospective jurors had any family members who were involved in law enforcement. He believed that his silence indicated a truthful response. He also stated that he interpreted the question about whether the prospective jurors had been victims of crime to relate to crimes similar to arson. He explained that he did not answer the victim of crime question because the murder of his brother's step-daughter and her husband by their son was "totally ... different [and not] relevant."

The trial court accredited the juror's testimony that he had no

8

recollection of the defendant at the time of the trial. The trial court also concluded that the juror responded truthfully to the question, "Have any of you been the victim of a crime?" While three or four other jurors indicated that they had been victims of a crime, juror Foster did not. When the trial court learned that juror Foster had a brother whose step-daughter and her husband that had been killed by their son, it decided that Foster just did not meet the definition of victim of that particular crime and that he had, in fact, been truthful by not responding to the question. Finally, the trial court found as fact that juror Foster had no bias against the defendant and any argument to the contrary qualified as "pure speculation."

Juror disqualifications are based upon either (1) propter defectum or (2) propter affectum. Partin v. Henderson, 686 S.W.2d 587 (Tenn. App. 1984). Objections based on general disqualifications, such as familial relationship, are within the propter defectum class and as such, must be challenged before a verdict. Id. at 589. In contrast, disqualification based on propter affectum exists due to some bias or partiality toward one party in the litigation. Id.; Toombs v. State, 270 S.W.2d 649, 651 (Tenn. 1954). Propter affectum objections may be made after the return of the jury verdict. Id.; Durham v. State, 188 S.W.2d 555, 557 (Tenn. 1945). Because the defendant claims bias or partiality in favor of the state, this is a case of propter affectum. State v. Furlough, 797 S.W.2d 631, 652 (Tenn. Crim. App. 1990).

In our view, the juror was truthful when he failed to respond to the question about whether he had been the actual victim of a crime. Defense counsel did not provide any definition to the term and there were no follow-up questions to broaden the inquiry. From the testimony presented, it does not appear that the juror intentionally withheld the information. More importantly, the evidence has not established that juror Foster was prejudiced against the defendant. The trial court

9

accredited the juror's testimony that he had no recollection of the defendant. That the defendant apparently did not recall juror Foster during jury selection lends credence to that claim. The evidence in the record does not preponderate against the conclusion of the trial court that there was no bias. Our review suggests that the verdict was not influenced by the nature of the meeting between the defendant and juror Foster some seven years prior to trial but instead was based upon the overwhelming proof of his guilt of aggravated arson.

Accordingly, the judgment is affirmed.

_____
Gary R. Wade, Presiding Judge

CONCUR:


_____
David H. Welles, Judge


_____
Joe G. Riley, Judge